CC-96-49                                              1

En el Tribunal Supremo de Puerto Rico

| | |
|---|---|
| JUAN HARGUINDEY FERRER<br>    Demandante-Peticionario<br><br>    V.<br><br>UNIVERSIDAD INTERAMERICANA DE PUERTO RICO Y FREDDIE MEDINA<br><br>    Demandados-Recurridos | Certiorari<br><br>99TSPR48 |

Número del Caso: CC-96-49

Abogados de la Parte Peticionaria: LCDO. HECTOR VARGAS DIAZ

Abogados de la Parte Recurrida: LCDA. FRANCISCA SANTIAGO NEGRON

Abogados de la Parte Interventora:

Tribunal de Instancia: Superior, San Juan

Juez del Tribunal de Primera Instancia: Hon. Carmen Celinda Ríos

Tribunal de circuito de Apelaciones: San Juan – Panel IV

Juez Ponente: Hon. Miranda de Hostos

Panel integrado por: Pres. Jueza Alfonso de Cumpiano y los Jueces Broco Oliveras y Miranda de Hostos

Fecha: 4/7/1999

Materia:

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

En el Tribunal supremo de puerto rico

Juan Harguindey Ferrer

 Demandante-peticionario

  v.      CC-96-49  CERTIORARI

Universidad Interamericana
de Puerto Rico y Freddie
Medina

 Demandados-recurridos

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, 7 de abril de 1999

¿Tiene el editor[1] de la traducción de una obra literaria, que ya está protegida por la Ley de Propiedad Intelectual federal[2], derecho a reclamar bajo nuestra Ley de Propiedad Intelectual[3] por el alegado daño moral que ha sufrido al no reconocerse su trabajo como editor y no compensarse dichos servicios? Esta es la interrogante a la que nos enfrentamos hoy.

---

[1] **Está en controversia si, en efecto, el demandante fue el editor. Este asunto no será objeto de determinación en esta etapa pues el caso llega ante nos vía desestimación.**
[2] **17 U.S.C. sec. 101 et seq..**
[3] **Ley Núm. 96 de 15 de julio de 1988, según enmendada, 31 L.P.R.A. sec. 1401, et seq.**

I

Robert F. Hehman ("Hehman") es el <u>autor</u> de la obra "General Biology Laboratory Activities"[4] y es quien posee los derechos de autor de la misma. En el año 1988, Hehman acordó con la Universidad Interamericana de Puerto Rico ("Universidad"), la Sra. Blanca Riesco y Burgess International Group ("Publicadora"), que su obra sería traducida y publicada en el idioma español.[5] La versión en español sería titulada "Manual de Laboratorio Biología Moderna y Actividades de Laboratorio Zoología".

El Dr. Juan Harguindey ("Harguindey"), demandante-peticionario, era empleado de la Universidad durante el año académico 1988-89. Éste se desempeñaba como instructor en el Departamento de Biología. Durante dicho periodo, Harguindey "...participó en el proyecto de editar material provisto de antemano consistente en las traducciones..."[6] de la obra en cuestión. La participación de Harguindey fue a solicitud del Dr. Freddy Medina ("Medina") quien también laboraba para la Universidad.[7] Es aquí donde comienza la discrepancia entre las partes.

Alega la Universidad que Medina solicitó la colaboración de Harguindey para "...editar las traducciones que se estaban haciendo para el Manual, dentro de su horario de trabajo y utilizando los recursos de la

---

[4] **Vol. I, II, III.**
[5] **Apéndice I de los recurridos.**
[6] **Alegato de la demandada-recurrida, págs. 2-3.**
[7] **Durante el año académico anterior, Medina fue el supervisor de Harguindey. Sin embargo, según la Universidad, cuando Medina solicitó la ayuda de Harguindey, ya no fungía como su supervisor.**

Universidad,..."[8]. Asimismo, Medina sostiene que, al solicitarle la edición a Harguindey, no concertó acuerdo o contrato alguno adicional al sueldo que recibía éste como empleado de la Universidad.

Por su parte, indica Harguindey que, a solicitud de Medina, confeccionó la edición del Manual de Zoología ("Manual"), y que se le prometió una retribución económica por el trabajo realizado. Dicha compensación, según Harguindey, sería adicional a su ingreso como profesor en la Universidad por ser éste un trabajo adicional fuera de sus funciones contratadas. "Específicamente se le señaló al demandante que se le pagaría lo que correspondiese del producto final de la obra...".[9]

Sostiene, además, Harguindey que el crédito por su trabajo fue adjudicado a Medina. A su vez, Medina alega que a Harguindey se le reconoció su labor como editor en la página de "Reconocimientos" del Manual. Además, manifiesta que Medina nunca reclamó derechos de autoría sobre el Manual.[10]

Así las cosas, el 3 de noviembre de 1993, Harguindey presentó demanda ante el antiguo Tribunal Superior de Puerto Rico, Sala de San Juan, contra la Universidad y Medina. Además de los señalamientos expuestos previamente, esbozó los siguientes hechos: que se le requirió "editar y

---

[8] **Alegato de la demandada-recurrida, pág. 3.**
[9] **Solicitud de Certiorari, pág. 2.**
[10] Alegan los demandados-recurridos que, tanto el autor Hehman como Burgess, suscribieron contratos para la traducción de la obra, por lo cual pagaron las regalías correspondientes a la Dra. Anna Lavernia y Blanca Riesco.

reorganizar lingüísticamente material de literatura... y hacer el mismo un trabajo publicable"; que la Universidad, por medio de Medina, acordó otorgar a Harguindey "la parte que correspondiere del producto final de la publicación como retribución económica así como el debido reconocimiento de su propiedad intelectual allí expuesta".[11]

Trabada la controversia, la Universidad solicitó que se desestimara el pleito por alegada falta de jurisdicción. Adujo que lo reclamado por Harguindey constituían daños patrimoniales, los cuales tenían que dilucidarse exclusivamente en el foro federal. El tribunal de primera instancia accedió a lo solicitado, desestimando la demanda por falta de jurisdicción.

Oportunamente, Harguindey acudió en apelación al Tribunal de Circuito de Apelaciones, cuestionando la determinación del tribunal de instancia. El referido foro apelativo confirmó la sentencia. El sustrato de su decisión fue que, a su juicio, al ser la reclamación una "...puramente económica y por tal razón en lo que respecta a los derechos patrimoniales de propiedad intelectual, equivalentes a los derechos protegidos por la ley federal, el campo está ocupado por lo cual no hay jurisdicción para considerar la misma."[12]

Inconforme, Harguindey acudió en certiorari ante este Tribunal. El peticionario le imputa al Tribunal de Circuito

---

[11] **Párrafos 2 y 3 de la demanda.**
[12] **Sentencia del Tribunal de Circuito de Apelaciones, pág. 6 (KLAN9500716).**

de Apelaciones haber errado al entender que no había jurisdicción en una controversia "...claramente contractual y a una acción en reclamo patente de los derechos extrapatrimoniales del demandante."[13]

Le concedimos término a la parte demandada-recurrida para que mostrase causa por la cual no debíamos expedir el auto solicitado y dictar Sentencia revocatoria de la emitida por el Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan.

Dentro del plazo concedido, en cumplimiento de dicha orden, ha comparecido la Universidad junto a Medina. En su comparecencia, desmenuzan las alegaciones de Harguindey con el objetivo de demostrar que el reclamo sólo le atañe al foro federal. Añaden que los argumentos sobre la labor realizada, y no pagada, no surgen de la demanda y que es en la oposición a la moción de desestimación donde, por primera vez, se levanta dicho punto.

II

El primer paso en todo análisis de propiedad intelectual es uno bastante sencillo: ¿posee el demandante "propiedad intelectual" sobre el bien en cuestión?. Sólo luego de contestar dicha interrogante es que procede, en buena metodología adjudicativa, ponderar si el reclamo versa sobre derechos patrimoniales o extrapatrimoniales, y, por ende, cuál foro, el federal o el estatal, posee

---

[13] **Solicitud de certiorari, pág. 3.**

jurisdicción para atender la disputa. *Autoría* es una condición *sine qua non* para cualquier reclamo de derechos de autor.[14] En el caso ante nos, tanto las partes como los dos foros judiciales antes mencionados omitieron el primer paso.

El derecho del autor sobre las creaciones <u>de su inteligencia</u>, para su publicación y explotación económica o para mantenerlas inéditas, constituye "propiedad intelectual".[15] En <u>Cotto</u> v. <u>Ríos</u>, Opinión y Sentencia de 17 de abril de 1996, este Tribunal, citando a Puig Brutau, definió la propiedad intelectual como "el conjunto de derechos que la ley reconoce <u>al autor sobre obras que ha producido con su inteligencia</u>, en especial los de que su paternidad le sea reconocida y respetada, así como que se le permita difundir la obra, autorizando o negando en su caso, la reproducción". (Énfasis suplido). Como norma general, el autor es quien, como cuestión de hecho, crea la obra; esto es, la persona que transforma una idea a una expresión tangible, merecedora de protección por la ley de

---

[14] Nimmer M.B., <u>Nimmer on Copyright</u>, 1993, Matthew Bender, Vol. I, §5.01(A) pág. 5-4.
[15] Miguel A. Del Arco Torres y Manuel Pons González, <u>Diccionario de Derecho Civil</u>, T. II, 1984, Aranzadi, S.A., pág. 445 citando al tratadista Diego Espín Cánovas.

Por otro lado, el Black Law's Dictionary define el derecho de autor ("Copyright") como "[a]n intangible, incorporeal right granted by statue <u>to the author or originator</u> of certain literary or artistic productions, whereby he is invested, for a limited period, with the sole and exclusive privilege of multiplying copies of the same and publishing them." Black's Law Dictionary, 5th ed., 1979, West Publishing, pág. 304. (Subrayado nuestro.)

propiedad intelectual. Community for Creative Non-Violence

v. Reid, 490 U.S. 730, 737 (1989). ¿Excluye esto la

posibilidad de que el editor[16] de la obra posea propiedad

intelectual? Esto es, ¿es el editor un "autor" para

propósitos de propiedad intelectual?.[17]

De un examen de nuestra Ley de Propiedad Intelectual[18]

se desprende que la propiedad intelectual de una obra

corresponde al autor por el solo hecho de su creación. En

esa misma corriente, el "Copyright Act" otorga al autor de

una obra el derecho "exclusivo"[19] de adaptar la misma, esto

es, el derecho a crear obras derivadas ("derivative work")

de la obra original. La ley federal de derechos de autor

describe el "derivative work" como:

> "... a work based upon one or more pre-existing
> works, such as a translation, fictionalization,
> motion picture version, sound recording, art
> reproduction, abridgement, condensation, or any
> other form in which a work may be recast,
> transformed or adapted..."[20] Además, véase Nimmer
> M.B., Nimmer on Copyright, 1993, Matthew Bender,
> Vol. I, §3.01 y ss.

---

[16] **Volvemos a enfatizar que no estamos adjudicando, en esta etapa, quién fue el editor de la obra; sólo nos ceñimos a las alegaciones de la demanda.**

[17] **Véase Russ Versteeg, *Defining "author" for the purposes of copyright*, 45 Am. U. L. Rev. 1323 (1996).**

[18] **Ley Núm. 96 de 15 de julio de 1988, 31 L.P.R.A. sec. 1401 et. seq..**

[19] **Value Group, Inc. v. Mendham Lake Estates, L.P., 800 F. Supp. 1228 (D.N.J. 1992).**

[20] **17 U.S.C. sec. 106(2).**

La obra derivada incluye "... editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship."[21]

Ahora bien, el hecho de que el "autor" de una obra retenga sus derechos con respecto a "obras derivadas"[22], ¿excluye la posibilidad de que el editor de la obra, entiéndase otra persona que no es el autor, posea propiedad intelectual?

A esos fines, el tratadista Lasso de la Vega nos ilustra a los efectos de que:

> "[l]os derechos y obligaciones del editor, su mayor o menor complejidad, obran en función de la doctrina jurídica que admitamos respecto del concepto de propiedad intelectual en general. [...]. [S]i, ..., la producción intelectual se considera propiedad individual, será indispensable observar una serie de reglas encaminadas a proteger al autor y al editor en sus derechos respectivos." J. Lasso de la Vega, El contrato de edición, Estades, Artes Gráficas, Madrid, Cap. IX, 1949, pág. 91.

---

[21] 17 U.S.C. sec. 101.

[22] Esto no significa que otra persona, que no es el autor, pueda crear una obra derivada al alterar la obra original. En ese caso, el derecho de autor en obras derivadas se extiende sólo a aportaciones de ese otro autor. Moore Pub. Inc. v. Big Sky Marketing, Inc., 756 F. Supp. 1371, 1374 (D. Idaho 1991); Apple Computer Inc. v. Microsoft Corp., 821 F. Supp. 616, 628 y ss., (N.D. Cal. 1993); 17 U.S.C. sec. 103. "Derivative work is copyrightable if it is sufficiently original; more than a modicum of originality is required." Waldman Pub. Corp. v. Landoll Inc., 43 F. 3d 775, 782 (2nd Cir. 1994). En el caso ante nos, según se desprende del expediente, el autor (Hehman) autorizó el trabajo en cuestión. La naturaleza de esa autorización –contractual–; si fue a Medina y si éste, a su vez, podía autorizar o ceder el derecho a otro (Harguindey) corresponde, en primer plano, al tribunal de instancia.

Fernández Mourillo, abundando un poco más, nos ofrece la siguiente tesis: "la propiedad intelectual, ..., se atribuye y tiene como sujeto, no sólo a la persona que produce rigurosamente la obra, sino también a otras que, con la base de esa producción y con intervención espiritual simultánea o posterior, o bien con intervención puramente material o de empresa, contribuyen a su publicación y difusión."[23] Al atender la edición, el comentarista expresa que "[e]n otro orden de fundamentos, pero también con reconocimiento del derecho de propiedad [intelectual], están los que, sin haber concebido la obra, [...] [se les] denomina como editores, respecto de los cuales, también la ley reconoce derecho de propiedad intelectual,...".[24]

Al momento de decidir si la "obra" de una persona debe recibir protección, las leyes sobre propiedad intelectual nos remiten a un concepto básico: la protección de una

---

[23] **M. Fernández Mourillo, <u>Legislación y Propiedad Intelectual</u>, 1930, 1ra ed., Editorial Reus, Madird, Cáp. XVII, pág. 86. Reseña el comentarista las distintas gradaciones en el área de propiedad intelectual. Por ejemplo, "[p]uede suceder que, existiendo publicada y atribuida a un autor determinada obra, haya quien se dedique a operar en ella alteraciones o cambios que, purgándola de defectos, o ampliando y adaptando su contenido a nuevas necesidades o circunstancias, vengan en realidad a darle una vida, naciendo con ella otra categoría de producciones literarias, a las que se les da el nombre genérico de transformadores de obras...". <u>Id.</u>, pág. 87. No estamos en posición de evaluar la labor que alega haber realizado Harguindey, sin embargo reconocemos que hay una gran gama de autorías sobre las que la ley concede propiedad intelectual en virtud del derecho de atribución.**

**Éste es uno de los pilares del derecho moral de autor, el cual será discutido más adelante.**
[24] **<u>Id.</u>, pág. 88.**

"expresión".[25] "La obra debe ser original del autor, en el sentido de que no sea copia de la obra de otra persona."[26] Para ilustrar el criterio de originalidad, Puig Brutau nos brinda el ejemplo del traductor. Al respecto, nos dice que "no hay duda de que en la medida en que ha de expresar ideas en un idioma distinto de aquel en que han sido originalmente expresadas, ha creado en cierto modo una obra original."[27]

Un criterio análogo rige en la jurisdicción federal. La ley federal alude al "original work of autorship". Al así hacerlo, lo que la ley federal requiere es una creación independiente, no una novedosa. Así, no se le denegará protección bajo la ley federal de propiedad intelectual a una obra simplemente porque es sustancialmente similar a una obra que fue producida previamente por otro autor y que, por ello, no es novel.[28] Originalidad, para fines del "Copyright Act", sólo significa que la obra debe su nacimiento al autor, esto es, que fue una creación independiente y no una copia de otras obras.[29] Además de ser una creación independiente, hace falta un grado "mínimo" de creatividad. Feist Publications, Inc. v. Rural Telephone Service Co. Inc., 499 U.S. 340, 345 (1991).

---

[25] **Para un análisis del alcance de la protección, véase el artículo de Mahony, I.G., en Copyright Infringement; Comparative Law Yearbook of International Business, Kluwer Law International, London, 1997, pág. 396 y ss.**
[26] **J. Puig Brutau, Fundamentos de derecho civil, 1973, 2da ed., Bosch, Barcelona, Tomo III, Vol. II, pág. 206.**
[27] **Id., citando a Marvin, pág. 207.**
[28] **Nimmer on Copyright, op. cit., § 2.01(a), pág. 2-7.**
[29] **Id., pág. 2-9.**

En el caso de autos, ¿qué expresión original expuso Harguindey en el Manual publicado que merezca protección? Alegadamente, la edición de la traducción de la obra original. El trabajo de edición tiene diversas manifestaciones. A manera ilustrativa, el Occupational Outlook Handbook, al tratar el aspecto de la edición, nos dice:

> [e]ditors select and prepare material for publication or broadcasting and supervise writers.
>
> [...]
>
> <u>Editors frequently write and almost always review, rewrite, and edit the work of writers</u>. However, their primary duties are to plan the contents of books, magazines, or newspapers and to supervise their preparation. They decide what will appeal to readers, assign topics to reporters and writers and oversee the production of the publications.[30] (Subrayado nuestro).

El trabajo de edición cumple con el estándar de "expresión". De hecho, el propio Reglamento para la Presentación, Depósito e Inscripción de Obras en el Registro de la Propiedad Intelectual[31] reconoce la autoría de la edición. En específico, el artículo 359(n)-23 reza:

> "[l]os autores de obras derivadas, incluyendo antologías, ediciones, traducciones o compendios obtendrán la autorización escrita del autor o autores de la obra original pre-existente o de los derechohabientes acreditados cuyos derechos no hayan prescrito."

---

[30] **Ocupational Outlook Handbook, U.S. Bureau of Labor Statistics, Washington, D.C., U.S. Department of Labor, Bureau of Labor Statistic, ed. 1996-97, pág. 4 y 5. Sobre las distintas acepciones de la "edición" véase <u>The encyclopedia of careers and vocational guidance</u>, 8th ed., 1990, J.G. Servicing Publishing, Chicago.**

[31] **Reglamento Núm. 4750, efectivo desde el 10 de septiembre de 1992.**

El hecho de que la edición es la criatura intelectual del editor es una perogrullada. Debe señalarse que la edición no usurpa la protección intelectual que el derecho le da al autor del texto; por el contrario, se trata de una <u>autoría independiente</u>. La "obra" del editor es, precisamente, la edición que fue <u>producto de su inteligencia</u>.[32] Puede que –en apariencia– no ostente la tangencia propia del libro; no obstante, la labor intelectual editorial, <u>en este caso</u> aparenta ser la "depuración neta"[33] del libro mismo. Por ende, esta creación amerita igual protección. "El autor al transmitir su derecho para la edición no ha renunciado a la paternidad

---

[32] **Precisamente ese es el reclamo de "autoría" que hizo Harguindey en la demanda. Véase la deposición que se le tomara a éste, Anejo X, pág. 42. El planteamiento del demandante es que Freddie Medina –no la publicadora– se atribuyó la autoría de la edición cuando en realidad la misma fue efectuada por Harguindey. Id., pág. 43.**

[33] **Aunque el caso de marras se encuentra en ciernes, nos parece que la labor "editorial" que alega haber realizado Harguindey no es la que, en términos generales, aluden los tratadistas al considerar "el editor". Tampoco parece ser la "edición" a que se refiere el Registro de la Propiedad Intelectual que dice: "[e]ditor incluye a todo el que publique libros con o sin discursos preliminares, notas apéndices, vocabularios, glosarios o ilustraciones." Artículo 359(n)-2 inciso (p). En lugar de ser un tipo de casa editora, que produce, publica y difunde el libro, intimamos que la labor en controversia es la depuración del libro. En la deposición que le fuera tomada a Harguindey, éste señaló que al requerirle su labor se le dijo: "[m]ira, te vamos a encargar que hagas la edición, que traspases, que traslades a un castellano legible, correcto e incluso elegante, si se puede decir, un libro de una norteamericana que está traduciendo sus capítulos la Doctora Margot Lavernia, ya se te pagará lo que corresponda". Pág. 14 de la deposición, Anejo X. Sin embargo, dado que la alegación de Harguindey es que fue el editor, en función de ello circunscribimos nuestro análisis.**

del libro. En consecuencia, el derecho -que es obligación

para el editor en este aspecto- a estampar su nombre como

autor del libro le corresponde, en principio, a él."[34]

Concluimos pues, de esa misma forma, que el editor también

tiene derecho a que la autoría de su trabajo -edición- sea

reconocido como tal. La edición constituye una "obra"

adicional e independiente del Manual *per se*; por eso,

constituye propiedad intelectual de su forjador. Como

señala Desantes:

> "[l]a relación social autor-editor, que surge con
> motivo de la publicación de un libro, es también
> una relación jurídica a la que se accede por el
> contrato de edición. [...] En tal relación
> jurídica los sujetos son -normalmente- los mismos
> del contrato, el contenido es el complejo de
> situaciones en que los sujetos se encuentran
> dentro de un entramado de derechos y obligaciones
> y el objeto es la edición misma como continente
> de una creación intelectual." (Énfasis suplido).[35]

III

Habiendo resuelto que el editor posee propiedad

intelectual sobre su labor editorial[36], corresponde

---

[34] **J.M. Desantes, La relación contractual entre autor y editor, 1970, Ediciones Universidad de Navarra, S.A., España, Cáp. I, pág. 143-144.**

[35] **Id., pág. 29.**

[36] **No nos compete aquí resolver si la labor en disputa constituye una de co-autoría. Sobre el particular véase Childress v. Taylor, 945 F. 2d 500 (2d Cir. 1991); Paul Goldstein, Copyright: Principles, Law, and Practices, § 4.21.2, pág. 379, (1989); en contraste, véase la posición de Nimmer al respecto, Nimmer on Copyright, op. cit., sec. 6.07, pág. 6-23. En específico, véase el análisis sobre co-**

dilucidar si dicho derecho es vindicable ante el foro federal o el estatal.

Según expresáramos en Cotto v. Ríos, ante, los derechos de la comunidad intelectual de Puerto Rico están protegidos por dos estatutos: la "Federal Copyright Act"[37] y la Ley de Propiedad Intelectual de Puerto Rico.[38] Además, de manera supletoria, aplican las disposiciones de nuestro Código Civil siempre que no sean incompatibles con la legislación federal. ¿Estamos ante un derecho patrimonial o uno extrapatrimonial?

Aun cuando ha sido atacada por varios sectores[39], "[e]n Puerto Rico la propiedad intelectual está formada por la imbricación de dos derechos de naturaleza diferente: el derecho moral, que de manera primordial protege el vínculo personal entre el autor y su obra y el derecho patrimonial que consiste en el monopolio de la explotación de la obra." Cotto v. Ríos, ante.[40]

De entrada, resulta meritorio señalar el hecho de que la protección del derecho moral del creador es independiente de la protección de sus derechos

---

autoría de derechos morales hecho por P.H. Karlen, *Joint Ownership of Moral Rights*, 38 J. Copr. Soc'y 242 (1991).

[37] 17 U.S.C. sec. 101 et. seq.

[38] Ley Núm. 96 de 15 de julio de 1988, 31 L.P.R.A. sec. 1401 et. seq..

[39] C.f. Ramos, D.A., *"Oh, Pretty Woman", Luke took your beauty away, may Nafta come to your rescue? Campbell v. Acuff-Rose, can there ever be "Moral Rights" in the United States or Puerto Rico?*, 29 Núm. 1 Rev. Jur. U.I.P.R. 173 (1994), págs. 188-195.

[40] Aún cuando la legislación federal ha comenzado a expandir su alcance para abarcar los derechos morales -Visual

patrimoniales. Ley Núm. 96, _supra_, 31 L.P.R.A. sec. 1401(b).

Al atender los derechos morales, el Reglamento para la Presentación, Depósito e Inscripción de Obras en el Registro de la Propiedad Intelectual[41] los define como:

> "... aquellas prerrogativas exclusivas del autor que lo facultan a defender la integridad de su obra, a determinar bajo qué condiciones y circunstancias ésta ha de divulgarse o publicarse, a atribuirse su autoría o a retractarla cuando la obra ya no coincida con sus convicciones intelectuales, artísticas o éticas,...". (Énfasis suplido).

Recientemente, el Profesor Pedro G. Salazar ha analizado, de forma abarcadora, el derecho moral de autor en Puerto Rico. Al respecto nos indica que:

> "[e]l llamado 'derecho moral' del autor es la contrapartida del derecho 'patrimonial' o de explotación que le permite a un autor beneficiarse económicamente de su creación. En conjunto, ambos constituyen el derecho autoral en toda su plenitud aunque, jurídicamente, son, cada cual, de naturaleza muy distinta."[42]

Asimismo, al atender el derecho moral del autor, Puig Brutau, citando a Kayser, reseña "[c]omo aspectos especialmente protegidos por el derecho moral de autor, ... los siguientes: el derecho a que sea reconocida la paternidad de su autor, el derecho a que no sea deformada o alterada sin su consentimiento y el derecho de arrepentirse

---

Artists Rights Act of 1990- los libros no están incluidos. 17 U.S.C. sec. 101 (A)(i).

[41] Artículo 359(n)-2(e).

[42] Salazar, P.G., _El derecho moral del autor en las legislaciones puertorriqueña, norteamericana y española,_ 31 Núm. 3 Rev. Jur. U.I.P.R. 407 (1997).

y a retirarla."[43] Se ha dicho que el derecho moral de autor cobija cuatro grandes áreas; una de ellas es el derecho de atribución. A esto nos referimos cuando, al definir propiedad intelectual, expresamos en Cotto v. Ríos, ante, que es "el conjunto de derechos que la ley reconoce al autor sobre obras que ha producido con su inteligencia, en especial los de que su paternidad le sea reconocida y respetada..." (Énfasis suplido). Éste es el derecho de atribución.

De lo anterior resulta forzoso concluir que el reclamo de Harguindey, de que otra persona se atribuyó la autoría de su obra --la labor editorial--, es una alegada violación al derecho moral de autor vindicable ante el foro estatal. Este reclamo, como expresamos antes, está cimentado en uno de los cuatro pilares básicos del derecho moral de autor: el derecho de atribución. Esto, en términos generales, no es otra cosa que el derecho del autor a que se le adjudique la autoría de la obra, claro esta, si es que éste así lo desea.[44] Así pues, si Harguindey logra demostrar que fue él, y no Medina, quien editó el Manual, el tribunal vendrá obligado a atribuirle la edición de la obra a quien determine que fue su verdadero autor.[45]

---

[43] J. Puig Brutau, op. cit., pág. 213. (Subrayado nuestro).

[44] Nuestra interpretación del derecho de atribución no restringe los linderos de tan importante derecho. Simplemente, no debemos extender nuestros pronunciamientos más allá de la controversia que nos compete.

[45] Claro, como expresáramos en Cotto v. Ríos, ante, aunque el derecho moral del autor, por no ser patrimonial, no es cuantificable en dinero, puede reclamarse una indemnización monetaria cuando el mismo sea lesionado.

En fin, en cuanto al reclamo de autoría de la edición, erró tanto el tribunal de instancia como el foro apelativo intermedio al declararse sin jurisdicción. Resolvemos así, teniendo como norte el estándar de revisión aplicable a casos que se dilucidan a través de una solicitud de desestimación. Sabido es que, al entender en una moción de desestimación debemos dar por ciertas y buenas todas las alegaciones hechas en la demanda. Ramos v. Marrero, 116 D.P.R. 357, 369 (1985); First Federal Savings v. Asoc. de Condómines, 114 D.P.R. 426 (1983). Además, hay que interpretarlas de la manera más favorable para el demandante. Unisys v. Ramallo, 128 D.P.R. 842 (1991); Romero v. E.L.A., 127 D.P.R. 724 (1991). Así, en casos como el de autos, donde se plantea la desestimación por falta de jurisdicción en la materia, es necesario determinar si, tomando como cierto lo alegado por el demandante, el foro tiene jurisdicción para atender el reclamo. Examinadas las alegaciones, concluimos que el tribunal tiene jursidicción sobre la materia pues se trata, en primera instancia, de uno de los pilares del derecho moral de autor: el derecho de atribución.

Ahora bien, para gozar de los beneficios de nuestra Ley de Propiedad Intelectual "...es necesario haber inscrito el derecho y las obras que lo sustentan en el Registro de la Propiedad Intelectual".[46] Sin embargo, en

---

[46] **Ley de Propiedad Intelectual**, supra, 31 **L.P.R.A.** sec. 1402(d), según enmendada.

situaciones tan peculiares como la de autos, cuando, precisamente, la alegación es que otra persona se atribuyó la autoría de la obra (edición) resolvemos que no será necesario que la obra esté inscrita. Como bien comenta el profesor Pedro G. Salazar, "[d]ado el carácter *personalísimo* del derecho moral no parecería necesario condicionar su "reserva" a la inscripción de la obra que lo sustenta en un Registro de Propiedad Intelectual. Ello se justifica plenamente en el caso de los derechos económicos, alienables y transferibles, para fines del establecimiento de una clara cadena de titularidad o "tracto sucesivo" y para facilitar la dilucidación judicial de controversias mediante presunciones rebatibles de título. [...] Exigir una inscripción registral para poder ejercer el derecho moral, como lo hace la Ley puertorriqueña, parecería contrario a la naturaleza misma de ese derecho."[47]

Por otro lado, no debe albergarse duda sobre el hecho de que no tenemos jurisdicción sobre el derecho a explotar económicamente la obra; éstos son reclamos patrimoniales. Es decir, si la reclamación de Harguindey versa sobre reproducción; regalías; distribución; etc., el foro federal será el que ostente la jurisdicción sobre la materia.[48] Los

---

[47] **Salazar, P.G., *El derecho moral del autor en las legislaciones puertorriqueña, norteamericana y española,* 31 Núm. 3 Rev. Jur. U.I.P.R. 407, 419 (1997).**
[48] **En Cotto v. Ríos, ante, expresamos que "[l]a Ley Federal de Derechos de Autor gobierna exclusivamente tan sólo los derechos legales o en equidad equivalentes a cualquiera de los derechos exclusivos, dentro del ámbito general del derecho de autor, especificados en la sección 10618 de la referida Ley, que en lo pertinente dispone:**

aspectos relacionados a la compensación de Harguindey sólo pueden dilucidarse en el foro estatal si no comprenden los mismos. Desde <u>Pancorbo</u> v. <u>Wometco</u>, 115 D.P.R. 495, 500 (1984), reconocimos varias acciones estatales que no estaban afectadas por el "Copyright Act"; entre éstas, están las fundadas en la <u>violación de un contrato</u> o de una relación fiduciaria, la difamación, y <u>las violaciones al derecho moral de autor</u>, entre otras. Así pues, dado que el reclamo de Harguindey aparenta ser de índole contractual, el tribunal tiene jurisdicción para entender en él. Claro, si se aparta de esos linderos y recae en las regalías, reproducción, etc., debe desestimarse <u>esa</u> reclamación.

En esa misma línea --remuneración económica-- como expresamos antes, la Universidad alega que este asunto no

---

"**Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:**

**(1)   to reproduce the copyrighted work in copies or phonorecords;**
**(2)   to prepare derivative works based upon the copyrighted work;**

**(3)   to distribute copies or phonorecords of the copyrighted works to the public by sale or other transfer of ownership, or by rental, lease, or lending;**
**(4)   in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and**
**(5)   in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly."**

fue planteado ni "mínimamente" en la demanda. De hecho, del expediente surge que uno de los fundamentos para oponerse a este asunto es que la Universidad entiende que esto es una reclamación de salarios no devengados que está prescrita.

Debido a que aún no se ha presentado prueba al respecto, no podemos pasar juicio sobre tal alegación. De un examen de las alegaciones del demandante, no puede concluirse si cuando Harguindey "acordó...[una] retribución económica"[49] lo hizo desde una relación obrero patronal --y, por ende, es una reclamación de salarios-- o si, por ejemplo, se trata de un contrato de servicios profesionales. Así pues, aunque las alegaciones expuestas por el demandante no son el mejor ejemplo a seguir, toda vez que las alegaciones pretenden esbozar a grandes rasgos la reclamación[50], debe determinar el foro de instancia de qué tipo de reclamación se trata; si la misma está prescrita o si, a solicitud de parte, puede enmendarse la demanda conforme a la Regla 13.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 13.1.

IV

A tenor con todo lo antes expuesto, procede decretar la revocación de la sentencia emitida por el Tribunal de

---

[49] **La alegación número tres de la demanda dice: "[q]ue la parte allí requirente acordó, por medio del Sr. Freddie Medina, otorgar al Sr. Harguindey la parte que correspondiere del producto final de la publicación como retribución económica así como el reconocimiento de su propiedad intelectual allí expuesta".**

Circuito de Apelaciones, devolviéndose el caso al foro de instancia para la continuación de procedimientos ulteriores consistentes con lo aquí resuelto.


                          FRANCISCO REBOLLO LÓPEZ
                              Juez Asociado

---

[50] **_Dorante_ v. _Wrangler of P.R._, Opinión y Sentencia de 27 de abril de 1998.**

En el Tribunal supremo de puerto rico


Juan Harguindey Ferrer

   Demandante-peticionario

     v.                         CC-96-49        CERTIORARI

Universidad Interamericana
de Puerto Rico y Freddie
Medina

   Demandados-recurridos


SENTENCIA


San Juan, Puerto Rico, 7 de abril de 1999


     Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida por el Tribunal de Circuito de Apelaciones, devolviéndose el caso al foro de instancia para la continuación de procedimientos ulteriores consistentes con lo aquí resuelto.

     Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal. El Juez Asociado señor Negrón García inhibido.


                      Isabel Llompart Zeno
              Secretaria del Tribunal Supremo