Opinión disidente emitida por
la Juez Asociada Señora Ro-dríguez Rodríguez.
A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy, or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.

James Madison

Hace ya un año, cuando este Tribunal en Suárez Cáceres v. Com. Estatal Elecciones, 175 D.P.R. 909 (2009) (Ro-dríguez Rodríguez, J., Op. disidente), optó por limitar el derecho al voto de los puertorriqueños, advertimos del “de-solado y escarpado camino” por el cual marchaba la Demo-cracia puertorriqueña. Hoy, una mayoría de este Tribunal empina aún más ese camino y continúa, a paso firme, de-valuando nuestra democracia y nuestros derechos consti-tucionales.
Elucubrando una teoría de autolimitación judicial al margen de normas de derecho vigentes claramente aplica-bles a esta controversia y que mandan otro resultado, la mayoría decide desestimar este recurso por considerarlo académico. Al así actuar, se desatiende el Derecho aplica-ble, se actúa contrario a lo que recientemente esa propia mayoría pautó, y se continúan menospreciando y apocando los derechos fundamentales de los ciudadanos y de la prensa frente al Estado.
Tenemos ante nuestra consideración dos recursos que versan sobre un mismo asunto, a saber: la decisión del Pre- *954 sidente del Senado de cerrar las gradas del Senado al pú-blico y a la prensa del país, y cómo ello compagina con la disposición constitucional que ordena que las sesiones de las cámaras sean públicas.(1) Art. III, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1.
Estamos llamados así, a impartirle contenido a una cláusula constitucional sobre la cual no nos habíamos ex-presado previamente. Nos confrontamos, sin duda, a una controversia de enorme trascendencia para la convivencia democrática en nuestro país. Se trata de una actuación gubernamental que, se argumenta, atenta contra el dere-cho de los ciudadanos a mantenerse informados sobre los asuntos que se dilucidan en la Asamblea Legislativa, en menosprecio del texto constitucional y del derecho ciuda-dano a acceder a información del gobierno. Dicha actuación menoscaba, además, las prerrogativas legislativas de sus miembros y que lacera el derecho de la prensa a informar y a fiscalizar a los gobernantes.
Se advierte de lo anterior la importancia que reviste la controversia ante nuestra consideración. Ello nos obliga, como punta de lanza, reflexionar brevemente en torno a los valores enjuego.
La democracia junto a la libertad de prensa y la de ex-presión, es un binomio indisoluble en nuestra sociedad. Existe una noción umversalmente aceptada, enraizada en las ideas “jeffersonianas”, de que no puede existir una so-ciedad libre si no existe libertad de expresión, encarnada ésta en una prensa libre. Por esta razón se asevera que sin libertad de prensa no hay democracia y sin democracia no hay libertad de prensa.
La libertad de informar y ser informado determina el grado de respeto que nuestra sociedad le reconoce a los *955 derechos humanos. El periodismo vigila las acciones de los gobernantes y la información que disemina permite que los gobernados abandonen el papel de espectadores acríticos de pseudorealidades, para convertirse en individuos deli-berantes, reflexivos y con conocimientos, cualidades todas indispensables del ámbito democrático. Es decir, el perio-dismo, al brindar información ayuda al ciudadano a ejercer su ciudadanía y a participar, de manera efectiva, en las decisiones de su gobierno. En una sociedad democrática, la prensa libre sienta las bases del debate público y la parti-cipación ciudadana.
Para que la prensa pueda ejercer ese rol fundamental, es indispensable que no pueda ser controlada por el go-bierno o manipulada para servir a los intereses de aquellos en el poder. Es por ello que se considera que sólo el perio-dismo libre e independiente es el único verdaderamente útil en la democracia.
Con estos valores en mente, pasemos a resumir los he-chos que le sirven de trasfondo a la delicada controversia que nos toca adjudicar en esta ocasión.
I
Comenzamos señalando que debido a la apresurada in-tervención que realizó una mayoría de este Tribunal al ex-pedir un recurso de certificación cuando la controversia es-taba planteándose inicialmente ante los tribunales,(2) no contamos con determinaciones de hechos establecidas por un foro judicial de primera instancia.(3) Ahora bien, habida *956 cuenta de que el Presidente del Senado y el Secretario del Cuerpo solicitaron en la petición de certification(4) la des-estimación de la demanda incoada en instancia y el recurso de mandamus presentado ante nosotros en jurisdicción original, invocando la Regla 10.2 de las nuevas Reglas de Pro-cedimiento Civil, 32 L.P.R.A. Ap. V, tomaremos como cier-tas todas las alegaciones fácticas bien hechas en las acciones incoadas por los demandantes. Harguindey Ferrer v. U.I., 148 D.P.R. 13, 30 (1999).(5) A continuación entonces los hechos que suscitaron la presente controversia, según han sido alegados por los demandantes.
Desde octubre de 2009, mientras se celebraban sesiones legislativas, el Presidente del Senado, Hon. Thomas Rivera Schatz, ordenó el cierre de las gradas desde donde la ciu-dadanía tradicionalmente podía observar los trabajos rea-lizados en el hemiciclo del Senado, impidiendo así el acceso del público. El 24 de junio de 2010 el Presidente del Senado también excluyó a todos los fotoperiodistas del palco desig-nado para los medios de prensa. Asimismo el 25 de junio del mismo año, último día disponible para la aprobación de medidas en la tercera sesión ordinaria de la decimosexta Asamblea Legislativa, el Presidente del Senado denegó el acceso a dicho palco a todos los medios noticiosos del país.
Durante esa sesión el senador por acumulación, Hon. *957 Eduardo Bhatia Gautier, presentó una moción al Cuerpo del Senado para que se permitiera el acceso de los medios de comunicación; ésta fue derrotada en la votación del Cuerpo. Posteriormente, el 28 de junio de 2010 el Presi-dente del Senado limitó el acceso de algunos periodistas a la sesión legislativa. A los reporteros que lograron presen-ciar las labores de los senadores se les prohibió el uso de cámaras.
Horas más tarde, el senador Bhatia Gautier presentó un recurso de mandamus en el Tribunal de Primera Ins-tancia contra el Presidente del Senado y el Sr. Manuel Torres Nieves, Secretario del Senado. Allí solicitó que se or-denara a los demandados cumplir con su deber ministerial de brindar acceso público a las sesiones legislativas, según ordena la Constitución del Estado Libre Asociado de Puerto Rico. Art. Ill, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1. Esta demanda fue enmendada días después para solici-tar también un injunction y una sentencia declaratoria, e incluir como demandantes a los senadores por acumula-ción: Eder Ortiz Ortiz, Sila Mari González Calderón, Juan Eugenio Hernández Mayoral, Jorge Suárez Cáceres, José Luis Dalmau, Alejandro García Padilla y Antonio Fas Alzamora. También incluyeron al Sr. Víctor Lozano Santos, residente del pueblo de Naranjito.
Por otra parte, el 29 de junio de 2010, la Asociación de Fotoperiodistas de Puerto Rico Inc., la Asociación de Perio-distas de Puerto Rico Inc., Cyber News Multimedia Inc., el Centro de Periodismo Investigativo Inc., y el Overseas Press Club presentaron ante nosotros un recurso de mandamus en jurisdicción original contra los mismos demandados. En este recurso, MD-2010-07, las entidades peticionarias reiteran los hechos alegados por los deman-dantes y recurridos en el recurso de certificación y solicitan que ordenemos al Presidente del Senado que cumpla el mandato constitucional de garantizar que las sesiones del Senado sean públicas, tanto para los ciudadanos como para la prensa. En la alternativa, requieren se le ordene al Pre-sidente del Senado cumplir con el Reglamento del Senado, *958 aprobado el 12 de enero de 2009, en cuanto éste garantiza el acceso de los ciudadanos a la Galería Alta del hemiciclo para presenciar las sesiones legislativas, Sec. 26.1, pág. 77, y dispone que el Presidente del Senado emitirá una orden administrativa para regular el uso de cámaras en las ins-talaciones, Sec. 26.11, pág. 81.
En esa misma fecha, 29 de junio de 2010 el Presidente del Senado promulgó la Orden Administrativa Núm. 10-63 para regular el uso de cámaras o equipo para captar imá-genes en el hemiciclo senatorial. Al día siguiente, y en vista de que la prohibición de acceso a las gradas por parte de la ciudadanía seguía en pie, el codemandante Senador Hernández Mayoral presentó una moción en el Senado para que se restableciera el acceso. La sesión legislativa, no obstante, expiró sin que el Presidente del Senado aten-diera la referida moción.
Así las cosas, el 2 de julio de 2010 los demandados pre-sentaron dos mociones para desestimar tanto la demanda en el foro primario, como el recurso de mandamus pen-diente ante nosotros, por considerar que las controversias planteadas no eran justiciables. Sin embargo, luego de que el Tribunal de Primera Instancia pautara una fecha para la vista del juicio en sus méritos, el Presidente del Senado y el Secretario acudieron entonces ante este Tribunal el 7 de julio de 2010, mediante un recurso de certificación intrajurisdiccional. Al cabo de dos días, el 9 de julio, una mayoría de este Tribunal decidió expedir la certificación, consolidarla con el recurso de mandamus y proveer cinco días a los demandantes y recurridos en la certificación para que presentaran su posición. Estos comparecieron oportunamente. Los peticionarios en el recurso de mandamus presentaron posteriormente su alegato.
II
A. Como dijimos, en los recursos ante nuestra conside-ración se cuestiona el cierre de las gradas del Senado de *959 Puerto Rico por el Presidente de ese Cuerpo. En su de-fensa, éste sostiene que la controversia que está ante nues-tra consideración no es justiciable, para lo cual invoca la totalidad de las doctrinas agrupadas bajo la sombrilla del principio de justiciabilidad. Solicita en consecuencia que se desestimen los recursos.
Primero, sostiene que los demandantes en el recurso de certificación carecen de legitimación activa para presentar su reclamación. Sobre los senadores demandantes indica que éstos no han sufrido daño alguno como tampoco se le han limitado sus prerrogativas legislativas, por lo que ca-recen de legitimación activa para acudir al tribunal. Indi-can que más bien lo que los senadores intentan es trasla-dar al foro judicial el debate legislativo que esta controversia generó en el Senado de Puerto Rico y en el cual no prevalecieron.
Respecto al ciudadano particular, señor Lozano Santos, sostienen que éste no ha sufrido un daño real, inmediato ni preciso pues la demanda sólo presenta un escenario hipo-tético en el cual si el individuo hubiera tratado de entrar a las gradas del hemiciclo “habría sido excluido”, como todos los demás ciudadanos.
En segundo lugar, el Presidente del Senado y el Secre-tario de ese Cuerpo, invocan la doctrina de cuestión polí-tica y la inmunidad parlamentaria para solicitar que este Tribunal no intervenga con la determinación tomada por el Presidente del Senado. Ello, según el fundamento de que hacer lo contrario supondría una violación al principio de separación de poderes.
Como tercera defensa la parte demandada arguye que ambos recursos, tanto el mandamus como la certificación, se han tornado académicos debido a que el Presidente del Senado restableció el acceso de los fotoperiodistas al palco del hemiciclo senatorial designado para los medios de co-municación y promulgó la Orden Administrativa Núm. 10-63 de 12 de enero de 2009.
Sobre el alcance de la Sección 11 del Artículo III de la Constitución, supra, afirman, que esta disposición no tiene *960 el alcance pretendido. Se arguye que el carácter público del que habla la Constitución no implica un derecho constitu-cional a estar presente en las gradas del hemiciclo senatorial. El Presidente del Senado sostiene que existen diversos medios para dar publicidad a las sesiones, como el diario de sesiones y la difusión por la internet, la televisión y la prensa, lo que es suficiente para darle cumplimiento al mandato constitucional, por lo que no cabe hablar de que se ha violado disposición constitucional alguna.
B. Por otro lado, los demandantes en el recurso de cer-tificación, aseveran que la actuación del Presidente del Se-nado de ordenar el cierre de las gradas, les coarta su pre-rrogativa constitucional de mantener informado a la ciudadanía y al electorado sobre su gestión legislativa. Por lo que los senadores demandantes afirman que su reclamo no se basa en un interés público general, sino que intentan vindicar una prerrogativa legislativa de rango constitu-cional.
Sostienen también, en consecuencia, que no se trata de trasladar al foro judicial una disputa sobre un asunto en el que no prevalecieron en el hemiciclo del Senado, sino más bien de una solicitud de que se le dé cumplimiento a una disposición constitucional que le reconoce una prerrogativa legislativa a cada senador. En este tenor, plantean que los medios alternos para dar publicidad a las sesiones legisla-tivas, como la difusión televisiva que actualmente realiza la Asamblea Legislativa a través del Canal 10 y el diario de sesiones, no son sustitutos adecuados de la presencia física de los ciudadanos y la prensa, que es posible gracias al acceso público que garantiza la Constitución.
Finalmente, argumentan que la controversia entre las partes no se ha tornado académica, pues el Presidente del Senado, incluso luego de adoptar la Orden Administrativa Núm. 10-63, reitera tener “poderes irrestrictos para excluir a la prensa y el público con sólo ordenarlo verbal-mente”. Contrario a lo alegado por los demandados, sostie-nen que la orden administrativa perpetúa la incertidum- *961 bre entre la ciudadanía y los medios noticiosos debido a que ésta facilita nuevos actos arbitrarios y caprichosos por parte del Presidente del Senado, por lo que no existe segu-ridad de que la parte demandada no va a repetir la con-ducta que originó los recursos ante nosotros.
Por su parte, los peticionarios en el recurso de mandamus opinan que las actuaciones del Presidente del Senado laceran el derecho de los ciudadanos y la prensa de acceso a la información en manos del Estado, protegido por el de-recho a la libertad de expresión y de la prensa. A su vez arguyen que la Orden Administrativa Núm. 10-63 no es una garantía suficiente de que los demandados acatarán el deber ministerial de mantener públicas las sesiones legis-lativas que alegadamente les impone la Constitución. Ello pues la orden no establece criterios objetivos ni procedi-mientos claros para ordenar la expulsión de los visitantes, permaneciendo entonces sujeto al capricho del demandado.
De igual forma exponen que en el supuesto de que un fotoperiodista tomara fotos del celular del Presidente del Senado durante el transcurso de la sesión —como alegan los demandados— resulta irrazonable y desproporcional expulsar de las gradas del hemiciclo a todos los miembros de la prensa; mucho más si no se provee justificación al-guna para el desalojo o simplemente se brinda una excusa de poca credibilidad unos días después.
Los peticionarios del recurso de mandamus también es-timan que la promulgación de la orden administrativa del Senado respondió a una táctica fallida que tenía la inten-ción de hacer los recursos ante nosotros académicos. Por último sostienen, al igual que los demandantes en el re-curso de certificación, que los medios alternos de publici-dad invocados por los demandados no pueden suplantar el acceso físico de todos los puertorriqueños a las sesiones legislativas.
Una vez resumidos los argumentos de las partes, pro-cede que pasemos a considerar los méritos de los asuntos traídos ante nuestra consideración.
*962 III
Aunque “es un axioma de la litigación constitucional que el Poder Judicial tiene facultad para revisar y deter-minar la constitucionalidad de las actuaciones de las otras ramas de gobierno”, Noriega Rodríguez v. Jarabo, 136 D.P.R. 497, 506-07 (1994), este Tribunal ha adoptado me-didas prudenciales de autolimitación judicial recogidas al amparo del concepto de justiciabilidad. Estas normas de carácter prudencial persiguen evitar una intervención a destiempo de la Rama Judicial en áreas sometidas al cri-terio de otras ramas de gobierno. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958).
Como discutimos, el Presidente del Senado ha invocado las reglas de justiciabilidad para solicitar la desestimación de los recursos ante este Tribunal. Pasemos entonces a evaluar sus planteamientos.
A. Reiteradamente hemos expresado que una parte posee legitimación activa para acudir al tribunal cuando: (1) ha sufrido un daño claro y palpable, (2) el daño es real, inmediato y preciso y no abstracto o hipotético, (3) existe conexión entre el daño sufrido y la causa de acción ejerci-tada, y (4) la causa de acción surge bajo el palio de la Cons-titución o un estatuto. Romero Barceló v. E.L.A., 169 D.P.R. 460 (2006); Col. Peritos Elec. v. A.E.E., 150 D.P.R. 327 (2000); Asoc. Maestros P.R. v. Srio. Educación, 137 D.P.R. 528 (1994); Hernández Torres v. Gobernador, 129 D.P.R. 824 (1992); Hernández Agosto v. Romero Barceló, 112 D.P.R. 407 (1982); Fund. Arqueológica v. Depto. de la Vivienda, 109 D.P.R. 387 (1980). Aplicando estos principios cuando quien reclama es un legislador, hemos establecido que éste tiene legitimación activa cuando busca vindicar un interés personal en el ejercicio pleno de sus prerrogati-vas legislativas. En estos casos, éste debe demostrar clara-mente cuál es el derecho constitucional o estatutario que busca defender y cómo la actuación del demandado se lo ha vulnerado. Hernández Torres v. Gobernador, supra, págs. *963 837-838. Véanse, además: Silva v. Hernández Agosto, 118 D.P.R. 45 (1986); Santa Aponte v. Srio. del Senado, 105 D.P.R. 750 (1977).
A esos efectos hemos resuelto que “la esencia de las pre-rrogativas legislativas es la garantía que tiene todo legis-lador a ejecutar plenamente su derecho constitucional a legislar, derecho comprendido en la Sec. 1 del Art. Ill de la Constitución de Puerto Rico”. Noriega v. Hernández Colón, 135 D.P.R. 406, 436 esc. 30 (1994), citando a Hernández Torres v. Hernández Colón et al., 131 D.P.R. 593, 601 (1992). Por ello, cuando un funcionario a cargo de una de las ramas políticas del gobierno incurre en actos que tras-tocan el procedimiento legislativo, los legisladores están legitimados para requerir que éste se lleve a cabo según lo ordena nuestra Constitución. Véase: Noriega v. Hernández Colón, supra. Cfr., Acevedo Vilá v. Aponte Hernández, 168 D.P.R. 443 (2006).
Igualmente, hemos sostenido que entre las funciones esenciales del legislador está la de “fiscalizar al gobierno, debatir asuntos de interés general e informar al país sobre la marcha de la cosa pública”. Romero Barceló v. Hernández Agosto, 115 D.P.R. 368, 375 (1984). Ello así, ya que estas prerrogativas sirven para que la Asamblea Legisla-tiva cumpla a cabalidad con su función representativa en el esquema constitucional de gobierno. Limitarle a un miembro de la Asamblea Legislativa su función o prerro-gativa de informar, o fiscalizar o debatir asuntos de interés público necesariamente lacera las prerrogativas constitu-cionales de ese legislador causándole un daño real.
Es en este contexto que los senadores demandantes ha-cen su reclamo. Ellos indican que la Sección 11 del Artículo III de la Constitución, supra, se configura como indispensable para el ejercicio pleno de la prerrogativa legislativa de informar al ciudadano, función que es inseparable a la función de legislar. Evidentemente las votaciones, los debates y otros trabajos que se llevan a cabo durante las sesiones legislativas en el hemiciclo del Senado forman parte integral del procedimiento legislativo. De la misma *964 forma, fiscalizar, informar y debatir asuntos de interés pú-blico, son potestades constitucionales del legislador.
La limitación de cualesquiera de estas facultades, se configura como un daño real y concreto, y no hipotético como reclaman los demandados. Cerrar las gradas del Se-nado al acceso de la ciudadanía, impide que un Senador pueda informarle directamente y de manera efectiva a la ciudadanía el tenor de su labor como tal. No tienen razón la mayoría de este Tribunal y el Presidente del Senado cuando indican que los Senadores demandantes no tienen legitimación activa para instar su demanda. (6)
Como se indicó, los demandados invocaron también la doctrina de separación de poderes —en particular el poder de la Asamblea Legislativa para adoptar reglas que rijan sus procedimientos y gobierno interno— como impedi-mento para que este Foro dilucide en sus méritos las con-troversias planteadas. Expresan que no corresponde a los tribunales pasar juicio sobre la interpretación y aplicación que el Cuerpo Legislativo realice de sus propios reglamen-tos, salvo que excedan el ámbito de los poderes que ostenta dicha Rama.
Ciertamente, la Asamblea Legislativa ostenta la facul-tad constitucional de adoptar e implantar normas para re-gir sus procesos internos. Noriega Rodríguez v. Jarabo, supra; Silva v. Hernández Agosto, supra. Sin embargo, también es cierto que esa facultad debe ejercerse sin exce-der el ámbito de los poderes que le han sido conferidos y observando, además, las limitaciones establecidas en la propia Constitución de Puerto Rico. Id. Precisamente, las controversias traídas ante la consideración de este Tribunal versan sobre la alegada transgresión del Artículo III, Sección 11, de la Constitución de Puerto Rico, supra, por parte del Presidente del Senado. No se cuestiona la facul-tad de las Cámaras Legislativas para adoptar e implantar *965 normas relativas a sus procesos internos. Más bien, el ar-gumento central plantea que el Presidente del Senado, am-parándose en el Reglamento del Senado, ha actuado arbi-trariamente impidiendo que la ciudadanía y los miembros de la prensa presencien las sesiones de ese Cuerpo, en con-travención a lo dispuesto en la citada disposición constitucional.
Ante planteamientos de esa índole, es el deber constitu-cional de este Tribunal ejercer nuestra facultad de inter-pretar la validez de las actuaciones legislativas impugnadas. Esa facultad se enmarca en el poder que os-tenta la Rama Judicial para “determinar si las otras ramas del Gobierno observaron las limitaciones constitucionales” y si sus actos exceden los poderes que le fueron delegados. Córdova y otros v. Cámara Representantes, 171 D.P.R. 789, 801 (2007). Es decir, por ser los tribunales los intérpretes finales de la Constitución también son los encargados de definir los contornos de las facultades de la Asamblea Legislativa. Santa Aponte v. Srio. del Senado, supra, pág. 759; Silva v. Hernández Agosto, supra, pág. 55.
El caso ante nuestra consideración no pretende trasla-dar al foro judicial una controversia interna de la Rama Legislativa. Se trata, más bien, de una controversia rela-tiva a la alegada violación por parte de miembros del Poder Legislativo de una exigencia constitucional cuyo alcance aún no ha sido interpretado por este Foro. Dejar al arbitrio del Presidente del Senado, o de dicho Cuerpo, la interpre-tación sobre el alcance del Artículo III, Sección 11 de la Constitución de Puerto Rico, supra, sería abdicar de nues-tra función como “intérpretes finales de las leyes y la Cons-titución, incluso de las actuaciones de las otras Ramas del Gobierno”. C.R.I.M. v. Méndez Torres, 174 D.P.R. 216, 227 (2008).
Los argumentos esbozados en las peticiones de desesti-mación, esencialmente, invitan a este Tribunal a permitir que el Poder Legislativo —y en particular el Presidente del Senado— se convierta en único juez de sus propios actos en patente contravención al sistema de pesos y contrapesos *966 establecido en la Constitución de Puerto Rico. C.R.I.M. v. Méndez Torres, supra. Véanse, además: Silva v. Hernández Agosto, supra, pág. 55 ("Nuestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos”); Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576, 591 (1983). Si bien es cierto que este Foro no está disponible para recrear el debate legislativo, nuestra función adjudicativa siempre prevalece “cuando las actuaciones de otras ramas de gobierno present [a] n cla-ros problemas de constitucionalidad y no meras disputas procesales o interpretativas”. Noriega Rodríguez v. Jarabo, supra, pág. 534.
En vista de lo anterior, en cuanto a la alegación de que la presente controversia es una cuestión política, basta de-cir que dicha norma no es aplicable cuando existen dere-chos individuales de alta jerarquía que podrían ser vulne-rados si los tribunales no intervienen. Noriega Rodríguez v. Jarato, supra, pág. 510, citando a F.W. Scharpf, Judicial Review and the Political Question: A Functional Analysis, 75 Yale L.J. 517 (1966). Por otro lado, debido a que se nos solicita que ordenemos al Presidente del Senado cumplir con lo que aparenta ser un deber ministerial de carácter constitucional, ajeno al ejercicio de su discreción, los de-mandados no están protegidos por la inmunidad parlamentaria. Acevedo Vilá v. Aponte Hernández, supra.
En síntesis, contrario a lo esbozado por los demandados, resolver si las actuaciones —alegadamente inconstitucio-nales— del Presidente del Senado cumplen con los pará-metros establecidos en nuestra Constitución, es función de este Tribunal y constituye un asunto justiciable a la luz de la doctrina de separación de poderes. Véase Silva v. Her-nández Agosto, supra, pág. 61.
C. Como fundamento adicional para que este Foro de-niegue examinar en los méritos las controversias plantea-das, los demandados invocan que los recursos instados se han tomado académicos. A pesar que una mayoría de este Tribunal hoy decide adoptar dicho parecer, soy del criterio *967 que tal planteamiento resulta claramente inmeritorio. Como discutiremos a continuación, el razonamiento que utiliza la mayoría de este Tribunal para concluir que este caso es académico, revela el estado pantanoso en el que se encuentra esta doctrina en nuestro país.(7) Resultará muy difícil, en lo sucesivo, encontrar criterios objetivos que per-mitan identificar cuándo un caso es o no es académico. Pa-semos a considerarlo con algún detenimiento.
Un caso inicialmente justiciable se torna académico cuando no persiste una controversia real o viva entre las partes debido a modificaciones acaecidas en los hechos o en el derecho que anulan los efectos prácticos que tendría un dictamen judicial. Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 724-725 (1980). Véase, además, P.N.P. v. Carrasquillo, 166 D.P.R. 70, 75 (2005). Ahora bien, se han reconocido varias excepciones que de estar presentes per-miten considerar en sus méritos un caso que, en primera instancia, parecería académico. P.N.P. v. Carrasquillo, supra, pág. 76; Angueira v. J.L.B.P., 150 D.P.R. 10, 19 (2000); Noriega v. Gobernador, 122 D.P.R. 650, 687-688 (1988); Com. de la Mujer v. Srio. de Justicia, supra, pág. 725. Una de dichas excepciones se presenta cuando la parte contra quien se reclama modifica los hechos que suscitaron la con-troversia o cesa voluntariamente su alegada conducta ile-gal, sin que tal modificación goce de visos de permanencia. Id.
El cese voluntario por parte del demandado, no consti-tuye impedimento para un pronunciamiento judicial salvo que existan garantías de que no repetirá su conducta ale-gadamente ilegal. Presidente de la Cámara v. Gobernador, 167 D.P.R. 149, 165-69 (2006) (Rodríguez Rodríguez, Op. disidente y fuentes allí citadas). Véase, también, United States v. W.T. Grant. Co., 345 U.S. 629, 632 (1953). Así, el demandado no podrá evitar los efectos de un dictamen judicial meramente por el cese transitorio de su conducta. *968 Véanse: Comisión de la Mujer v. Srio. de Justicia, supra, pág. 728 (“un caso no se torna ilusorio por conducta volun-taria de un demandado, quien luego puede ‘retornar a sus viejos caminos’ ”); Rullán v. Fas Alzamora, 166 D.P.R. 742, 764-765 (2006) (“Aunque los tribunales pierden su juris-dicción sobre un asunto cuando ocurren cambios durante el trámite judicial de un caso que hacen que éste pierda ac-tualidad, los cambios tácticos o judiciales a los que hace referencia la jurisprudencia no pueden ser, bajo ninguna circunstancia, resultado de una actuación del demandado para burlar [la] facultad revisora [de un tribunal apelativo] respecto a un caso que está sub júdice [sic]”).
Mediante la aplicación de la referida excepción, la posi-bilidad de que el demandante obtenga los remedios que en derecho procedan, y el ejercicio pleno del poder judicial, no quedan subordinados al arbitrio o la sola voluntad del demandado. Ello se logra requiriendo que el cese de la con-ducta esté acompañado de circunstancias que objetiva-mente le confieran un carácter de permanencia. Véanse, e.g.: Fed. Nat. Mortg. Assoc. v. Corchado, 145 D.P.R. 175 (1998); El Vocero v. Junta de Planificación, 121 D.P.R. 115 (1988), discutidos en J.J. Alvarez González, Derecho cons-titucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 191.
Corresponde al foro judicial examinar si el cese de la alegada conducta ilegal por parte del demandado goza de visos de permanencia. Para ello resulta claramente insufi-ciente un acto de fe en la afirmación del propio demandado de que no incurrirá nuevamente en la alegada conducta ilegal, tal como aparenta hacer la Opinión del Tribunal. Quien ha cesado voluntariamente su conducta, e invoca tal hecho como fundamento de que el caso se ha tornado aca-démico, tiene el peso de demostrar que en el futuro no re-petirá las actuaciones impugnadas. Véase Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 190 (2000) (“[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly *969 wrongful behavior could not reasonably be expected to recur”). En ese tenor, le corresponde establecer de forma clara que no existen expectativas razonables de que incu-rrirá nuevamente en la alegada conducta ilegal. íd. Véanse, además: United States v. Phosphate Export Assn, 393 U.S. 199, 203 (1968); United States v. W.T. Grant Co., supra.
A la luz de la normativa antes expuesta, no procedía en el caso de autos la desestimación de los recursos presenta-dos por los demandantes sin que este Tribunal tuviese ante sí los elementos de juicio necesarios para negar la aplica-ción de la excepción a la doctrina de academicidad antes discutida, a saber: que la modificación de la conducta im-pugnada no goza de visos de permanencia. Máxime cuando los recursos ante nuestra consideración versan sobre la alegada transgresión por parte del demandado de una dis-posición de jerarquía constitucional —la exigencia de que las sesiones de ambas Cámaras de la Asamblea Legislativa sean públicas— y no existen garantías de que las referidas actuaciones no se repetirán.
Los argumentos esbozados en las peticiones de desesti-mación, así como el razonamiento que ofrece la Opinión del Tribunal, son insuficientes para establecer o demostrar de forma clara que las actuaciones —alegadamente inconsti-tucionales— del Presidente del Senado, no volverán a suscitarse. Tras examinar detenidamente los fundamentos expuestos en las peticiones de desestimación notamos que en éstas, esencialmente, se argumenta que el Presidente del Senado ostenta una “amplia discreción” para conducir los trabajos de dicho Cuerpo de forma tal que prevalezca el “orden y el decoro en todos los predios”. En ese tenor se cita el Reglamento del Senado, el cual le confiere al Presidente de dicha entidad la facultad de “ordenar el desalojo inme-diato de dichos lugares, así como el arresto de las personas que ocasionaron o promovieron la situación”. Sec. 6.1(j) del Reglamento del Senado, supra, pág. 13.
Por otra parte, tanto en la Opinión del Tribunal como en las peticiones de desestimación, se invoca la Orden Admi- *970 nistrativa Núm. 10-63 como garantía de que no se repeti-rán actuaciones como las que suscitaron la presentación de los recursos de certificación y mandamus. Ello según el argumento de que la discreción del Presidente del Senado está limitada por la referida orden administrativa y que dicho funcionario está obligado a su cumplimiento. No obs-tante, el lenguaje amplio incluido en la Orden Administra-tiva Núm. 10-63 le confiere al Presidente del Senado la facultad de “cancelar en cualquier momento la autoriza-ción” conferida a un miembro de la prensa que según su criterio “actúe contrario al orden y al decoro del Cuerpo”. Art. 3, Orden Administrativa del Senado Núm. 10-63, pág. 2.
Al analizar en conjunto las disposiciones del Regla-mento del Senado y de la Orden Administrativa Núm. 10-63, puede colegirse que ellas confieren al Presidente del Senado una “amplia discreción” —según se califica en las peticiones de desestimación— para tomar medidas que es-time necesarias para mantener el “orden y el decoro del Cuerpo”. En virtud de ello, los demandados afirman que las alegadas actuaciones ilegales del Presidente del Se-nado constituyeron un ejercicio válido de sus prerrogativas para “garantizar la publicidad de los procesos legislativos mediante distintos medios y, por otro lado, salvaguardar el orden y el decoro que exige el Hemiciclo Senatorial”. La parte demandada emitió de esta forma su propio juicio so-bre la validez constitucional de sus actuaciones y reclama que tal criterio debe estar exento de ser revisado por este Tribunal.
Lo argüido en las peticiones de desestimación, lejos de garantizar que no se suscitarán nuevamente las alegadas actuaciones ilegales, reafirman que la postura del Presi-dente del Senado y de la mayoría de ese Cuerpo es que éstas constituyen ejercicios válidos de sus prerrogativas y no lesionan la disposición constitucional que exige que las sesiones legislativas sean públicas. Tal posición, evidente-mente, dista mucho de constituir una garantía de que no se repetirá la alegada conducta ilegal. Por el contrario, su- *971 giere la inclinación de repetir actuaciones como las impug-nadas si, según el solo criterio del Presidente del Senado, ello es necesario para mantener sus propios estándares de orden y decoro en el hemiciclo del Senado.
La firmeza con la que una mayoría de este Tribunal ha desestimado la controversia de autos por entender que ésta se ha tornado académica, contrasta marcadamente con lo que ha sido su postura en casos recientes. Veamos.
En Pueblo v. Pagán Medina, 177 D.P.R. 842 (2010), en una singular aplicación de la doctrina de academicidad, la mayoría razonó que el solo hecho de que ese caso estuviera pendiente ante este Foro era causa suficiente para aplicar la excepción de recurrencia de la doctrina de academicidad, negándose así a desestimar el pleito pendiente. íd. Al así resolver, la misma mayoría que hoy desestima este caso indicó lo siguiente: “la cuestión ante nuestra consideración es recurrente toda vez que, al estar pendiente de adjudica-ción ante este Tribunal una solicitud de reconsideración, no se ha pautado de manera final y firme la norma aplicable. Su importancia es aún mayor debido a que lo que tenemos ante nuestra consideración es la interpretación de una norma constitucional íd., págs. 844-845. Cierta-mente, según la flexible teoría avalada en esa ocasión por la mayoría del Tribunal, no comprendemos cómo no se pueda trasladar esta teoría al caso de autos.
Por otro lado, llama marcadamente la atención que, aún sin haberse secado la tinta en U.P.R. v. Laborde Torres y otros I, 180 D.P.R. 253 (2010), la mayoría olvida lo allí resuelto. Pero no tan sólo lo olvida, sino que parecería ser que este caso no existe, pues ni siquiera se menciona en la opinión.
Como sabemos, recientemente en U.P.R. v. Láborde Torres y otros I, supra, la mayoría de este Tribunal entendió que la aprobación por parte de “los estudiantes” de un “voto preventivo de huelga” en una asamblea estudiantil, sin más, era fundamento adecuado para resolver que el cam-bio en conducta de los demandados no mostraba visos de permanencia. Tal razonamiento viabilizó que se aplicara al *972 caso la excepción a la doctrina de academicidad conocida como la excepción del cese voluntario de la actuación im-pugnada, a la que hicimos referencia anteriormente.
Esta conclusión de la mayoría sirvió de preludio para luego de decretar que la controversia era justiciable, enten-der en los méritos del caso en el cual se conculca el derecho a la libre expresión en la Universidad de Puerto Rico. Véase U.P.R. v. Laborde Torres y otros I, supra. En Laborde Torres, la mayoría del Tribunal indicó: “[n]o existe una ga-rantía real de que los estudiantes no habrán de incurrir en la conducta impugnada, especialmente luego de la aproba-ción del Voto preventivo de huelga’. Por el contrario, su conducta es un indicio razonable de que podría volver a ocurrir otra paralización de la U.P.R. y que la intención de los estudiantes recurridos nunca fue culminar con la con-troversia de autos.” íd., pág. 284.
En ese proceso, la mayoría de este Foro tomó conoci-miento judicial motu proprio, sobre un hecho adjudicativo esencial para atender la controversia sobre academicidad: la aprobación de un “voto preventivo de huelga” en una asamblea estudiantil. Ello sin antes brindarle a los recu-rridos en ese caso, la oportunidad de expresarse en torno a si tal ejecutoria era procedente en derecho, según es reque-rido por ley.
Se sostuvo en ese caso, además, que los estudiantes te-nían la carga de probar que “su conducta con relación al fin de la huelga [sería] permanente”. U.P.R. v. Laborde Torres y otros I, supra, pág. 284. Y entendió la mayoría, que tal carga probatoria no se satisfizo con la suscripción por las partes de un acuerdo transaccional que fue presentado ante el Tribunal de Primera Instancia y que propició el fin de la huelga estudiantil. Id.
De atenernos fielmente a lo resuelto por la mayoría en U.P.R. v. Laborde Torres y otros I, supra, procedería con-cluir en este recurso, que eran los demandados —el Presi-dente del Senado y otros— sobre quienes recaía el peso de demostrar que en el futuro no repetirán las actuaciones impugnadas. Este análisis nos llevaría también a concluir, *973 que la Orden Administrativa Núm. 10-63 que reglamenta el uso de cámaras o equipo para captar imágenes en el hemiciclo senatorial, no es suficiente en derecho para re-vestir de permanencia la acción del demandado permi-tiendo nuevamente el acceso a las sesiones legislativas. De la misma forma que el acuerdo suscrito por los estudiantes en Laborde Torres no fue suficiente para satisfacer el peso de la prueba de que no se incurriría en la actuación impug-nada nuevamente por lo que el caso no era académico, así también la orden promulgada por el Presidente del Senado no puede satisfacer ese quantum de prueba de que no vol-verá a cerrar las gradas del Senado, por lo que este caso tampoco es académico.
A lo anterior se suma la alegación de los demandantes de que el Presidente del Senado ha manifestado pública-mente, tal y como recoge la prensa del país, que volvería a repetir la conducta cuya constitucionalidad ha sido cuestionada. Esta última alegación tiene el mismo efecto que el voto preventivo de huelga del caso de Laborde Torres, sobre el cual la mayoría tomó conocimiento judicial; procedería entonces, en ánimo de ser consistentes, que la mayoría del Tribunal tomara conocimiento de estas expre-siones del Señor Presidente del Senado. El paralelismo en-tre este caso y los hechos en Laborde Torres es más que evidente; lo inexplicable es que en un caso la mayoría con-cluya que aplica la doctrina de academicidad y en el otro no. Y que entre un caso y otro, sólo medien días. La incon-sistencia entre los dictámenes es patente. Ello crea la im-presión de que el marco legal se adapta a las necesidades de los actores políticos, lo que erosiona la confiabilidad de la ciudadanía en este Tribunal.
Cabe entonces cuestionarnos sobre las razones por las cuales la aplicación de la doctrina de academicidad en el caso de autos se revela irreconciliable con los precedentes sentados recientemente en Pueblo v. Pagán Medina, supra, y en U.P.R. v. Laborde Torres y otros I, supra. Sumando la decisión que ahora nos ocupa, en menos de un año se tras-ladan a la perpetuidad tres dictámenes emitidos por esta *974 Curia cuyas interpretaciones de la doctrina de academici-dad levitarán mancilladas por la inconsistencia. ¿Será que nuevamente el vaivén de las olas arropa el entendimiento y provoca un tracto jurisprudencial zigzagueante y dúctil? Véase Yiyi Motors, Inc. v. E.L.A., 177 D.P.R. 230 (2009), Martínez Torres, J., Op. de conformidad, págs. 286-287.
Así pues, ante el cuadro fáctico que tuvo lugar en este caso, procedía que este Foro examinara si las alegadas ac-tuaciones inconstitucionales del Presidente del Senado son o no legítimas a la luz de la exigencia del Artículo III, Sec-ción 11 de la Constitución de Puerto Rico, supra. Ello, por no haber cumplido los demandados su carga de establecer, de forma clara, que no existen expectativas razonables de que se no se repetirán las actuaciones impugnadas en el futuro.
Ya que estimo errada la decisión mayoritaria de deses-timar los recursos, procederé a evaluar los contornos de la cláusula constitucional que provocó la presente contro-versia.
IV
Nosotros, el pueblo de Puerto Rico, a fin de organizamos políticamente sobre una base plenamente democrática, promo-ver el bienestar general y asegurar para nosotros y nuestra posteridad el goce cabal de los derechos humanos, puesta nuestra confianza en Dios Todopoderoso, ordenamos y estable-cemos esta Constitución para el Estado Libre Asociado que en el ejercicio de nuestro derecho natural ahora creamos dentro de nuestra unión con los Estados Unidos de América.
Al así hacerlo declaramos:
Que el sistema democrático es fundamental para la vida de la comunidad puertorriqueña;
Que entendemos por sistema democrático aquel donde la voluntad del pueblo es la fuente del poder público, donde el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas .... Preámbulo de la Constitución del Es-tado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 2008, pág. 266.
*975 La elocuencia de la declaración de Pueblo incluida en el Preámbulo de nuestra Constitución demuestra la claridad de las aspiraciones de aquellos hombres y mujeres que se reunieron por primera vez el 17 de septiembre de 1951 para desarrollar y establecer lo que sería la base jurídica de la ordenación político-social del pueblo puertorriqueño. No hubo vacilación en establecer que “el sistema democrá-tico es fundamental para la vida puertorriqueña” y que el sistema democrático es “aquel donde la voluntad del pueblo es la fuente del poder público ... y donde se asegura la libre participación del ciudadano en las decisiones colectivas”. Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico, supra.
Para que esa fuente del poder público, la voluntad del Pueblo, pueda verse concretizada adecuadamente, se reco-nocen varios derechos en el Artículo II de nuestra Carta de Derechos. Uno de los principales y más preciados es el de-recho al sufragio “universal, igual, directo y secreto” como herramienta para que el pueblo pueda establecer el pro-grama de gobierno que entienda correcto. Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 278. No hay duda de que la ciudadanía reconoce el “valor del voto como su principal arma y piedra angular del sistema democrático”. P.P.D. v. Admor. Gen. de Elecciones, 111 D.P.R. 199, 210 (1981).
El ejercicio democrático y la “libre participación del ciu-dadano en las decisiones colectivas”, no obstante, no sólo se manifiestan intermitentemente en el voto eleccionario de cada cuatro años. La democracia es un continuo que no se interrumpe temporalmente en ausencia de consultas elec-torales masivas, sino que se cultiva día a día mediante la participación en, y la discusión y fiscalización de, la gestión pública de aquellos elegidos a representamos. Es por esto que la Constitución reconoce, como herramienta para lo-grar lo anterior, la libertad de palabra, de prensa y el de-recho a pedir al gobierno la reparación de agravios en todo momento. Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1.
*976 Consustancial con los derechos antes mencionados, este Tribunal reconoció, como derecho constitucional fundamental, el acceso a la información en manos del Estado. Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982). Allí, indi-camos que
[e]s lógico, pues, concluir que existe una estrecha correspon-dencia entre el derecho a la libre expresión y la libertad de información. La premisa es sencilla. Sin conocimiento de he-chos no se puede juzgar; tampoco se puede exigir remedios a los agravios gubernamentales mediante los procedimientos ju-diciales o a través del proceso de las urnas cada cuatro (4) años. Id., pág. 485.
Añadimos, citando a Dávila v. Superintendente de Elecciones, 82 D.P.R. 264, 279 (1960), que “[l]os ciudadanos de una sociedad que se gobierna a sí misma deben poseer el derecho legal de examinar e investigar cómo se conducen sus asuntos, sujetos sólo a aquellas limitaciones que im-pone la más urgente necesidad pública”. (Enfasis suplido.) Soto v. Srio. de Justicia, supra. En ese tenor, en Soto deli-neamos unas situaciones en las cuales el derecho de acceso a información pública cede ante ciertos reclamos del Es-tado que han de ser —en todo caso— de la más alta jerar-quía y sujetos a un escrutinio judicial estricto. Véase Colón Cabrera v. Caribbean Petroleum, 170 D.P.R. 582, 592 (2007).
Ese esquema de acceso a información y transparencia en el manejo de los asuntos públicos, permea igualmente el Artículo III de nuestra Constitución que regula a la Asam-blea Legislativa. Y es que es natural que, siendo la Asam-blea Legislativa la rama gubernamental más representa-tiva de la voluntad del pueblo, todos los ciudadanos que constituyen el poder público tengan el derecho de conocer —de primera mano— las discusiones de la cosa pública que allí se realizan. No podemos olvidar que “ [e] 1 derecho a saber es un pilar indispensable de la sociedad democrática”. E. Rivera Ramos, La libertad de informa-ción: necesidad de su reglamentación en Puerto Rico, 44 (Núms. 1-2) Rev. Jur. U.P.R. 67, 68 (1975).
*977 En ese contexto, el Artículo III de la Constitución in-cluye varias cláusulas que obran como mecanismos para lograr la diseminación de información desde las Cámaras hacia los constituyentes. Se trata de la cláusula que exige que las sesiones camerales sean públicas y aquella que or-dena la publicidad de los procedimientos legislativos me-diante un diario de sesiones. Art. Ill, Secs. 10 y 17, Const. E.L.A., L.P.R.A., Tomo 1. Dichas cláusulas tienen una na-turaleza dual que sirve a un propósito similar: (1) se impo-nen como obligaciones a ambos cuerpos legislativos de que deben actuar conforme a los postulados contenidos en ellas al ejercer sus funciones legislativas, de modo que los repre-sentados conozcan la labor de sus representantes, y (2) constituyen garantías para la ciudadanía y para los pro-pios legisladores, de que los asuntos debatidos en cada una de las Cámaras se difundirán adecuadamente dentro y fuera del Capitolio de Puerto Rico para el beneficio de éstos y de futuras generaciones.
Una de las cláusulas establecidas en la Constitución para permitir que toda la ciudadanía conozca lo que ocurre en las Cámaras Legislativas es, precisamente, la que está en controversia en este caso. La Sección 11 del Artículo III de nuestra Constitución, supra, establece que “[l]as sesio-nes de las cámaras serán públicas”. Aunque toda disposi-ción constitucional o estatutaria siempre está sujeta a diversas interpretaciones, Nogueras v. Hernández Colón, 127 D.P.R. 405, 411-412 (1990), considero que la nitidez del verbo utilizado en la mencionada cláusula deja una sola interpretación posible. Se trata de un lenguaje sucinto y sencillo —pero tajante— cuyo significado es evidente: las sesiones de cada una de las Cámaras estarán abiertas al público para que cualquier ciudadano o ciudadana pueda presenciar los trabajos de aquellos y aquellas que los representan. Como afirmó el Informe de la Comisión de la Rama Legislativa de la Asamblea Constituyente, el propó-sito de dicha cláusula es “asegurar al pueblo la oportuni-dad de escuchar los debates legislativos ...”. 4 Diario de *978 Sesiones de la Convención Constituyente de Puerto Rico 2583 (1961).
Qué mejor forma de que el pueblo pueda conocer las funciones que llevan a cabo nuestros legisladores durante una sesión legislativa que estar presentes en éstas y así ver el comportamiento de ellos durante las sesiones, ade-más de escuchar de primera mano los argumentos a favor o en contra de los asuntos allí discutidos. Que todo ciuda-dano pueda sentarse en las gradas de cualquiera de las Cámaras a observar la dinámica legislativa y cómo los dis-tintos intereses allí presentes convergen en legislación que le afectará directa o indirectamente es, indudablemente, un modo superior de fiscalización de la cosa pública y de nuestros representantes gubernamentales. De esa manera, los ciudadanos pueden asegurarse que las leyes allí apro-badas son “el producto de un proceso meditado en amplia deliberación” que procura “el progreso y engrandecimiento del pueblo”. N. Rigual, El poder legislativo de Puerto Rico, Río Piedras, E.D.U.P.R., 1961, pág. 20.
Mediante la participación del pueblo en las sesiones le-gislativas, la ciudadanía puede pasar juicio sobre la labor de sus representantes directamente y sin filtros, de modo que puedan foijar una opinión propia y no manipulada so-bre los trabajos legislativos. Así, se garantiza el flujo de información que permite el ejercicio responsable del dere-cho y el deber de cada persona de tomar parte en los asun-tos que le conciernen. Rivera Ramos, supra, pág. 69.
Igualmente, las sesiones públicas son una herramienta adicional al elector para que al momento de efectuar su selección de cada cuatro años, no sólo dependa de anuncios comerciales o estribillos realizados por especialistas en propaganda audiovisual, sino que conozcan la calidad y al-tura de los debates que se desarrollan en el Capitolio de Puerto Rico y sus respectivos protagonistas. El más pre-ciado de nuestros derechos, el derecho al voto, sería un derecho huero de significado, si al ciudadano se le impide conocer directamente el historial de quienes pretenden su voto.
*979 Es evidente de todo lo anterior, que la propia estructura de poderes forjada en nuestra Norma Fundamental, el sis-tema republicano de gobierno, exige que el ciudadano tenga derecho a estar informado de los procesos delibera-tivos del gobierno. Y este derecho es efectivo únicamente mediante el acceso directo a esas deliberaciones. Véase J. Assaf, Mr. Smith Comes Home: The Constitutional Presumption of Openness in Local Legislative Meetings, 40 Case W. Res. 227, 230 (1990). Véase, además, Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980). Consecuentemente, la Sección 11 del Artículo III de la Constitu-ción, supra, se revela imprescindible para la supervivencia misma de nuestro sistema de gobierno.
No podemos perder de vista también que “[e]l público puede ser un importante freno en el ejercicio arbitrario del poder por parte del gobierno. Sin embargo, este freno sólo puede funcionar si el gobierno proporciona información so-bre sus acciones”. S. Rose-Ackerman, La corrupción y los gobiernos: causas, consecuencias y reforma, Madrid, Siglo Veintiuno de España Editores, 2001, pág. 223. La apertura de los procesos legislativos es, no tan sólo un potente pro-filáctico contra el ejercicio arbitrario del poder, sino que es también un recio detente contra la corrupción.
Por otro lado, como dijimos, la cláusula constitucional que exige que las sesiones camerales sean públicas, no sólo constituye una obligación de los Cuerpos Legislativos y un derecho de la ciudadanía, sino que estructura un meca-nismo adicional para que los legisladores individuales pue-dan cumplir con una de sus funciones principales: informar. En Romero Barceló v. Hernández Agosto, supra, pág. 375, reconocimos que los legisladores tenían entre sus funciones esenciales, además de formular legislación, “fis-calizar al gobierno, debatir asuntos de interés general e informar al país sobre la marcha de la cosa pública”.
Indicamos, además, que dichas funciones provienen del propio concepto de un gobierno dividido en tres poderes y no están subordinadas a la prerrogativa de legislar. Romero Barceló v. Hernández Agosto, supra. La función de *980 fiscalizar, debatir asuntos de interés público e informar al país tienen su propia justificación, pues “contribuyen al desempeño por una asamblea representativa de su papel constitucional”. Id. Concluimos que “la limitación de al-guna de las funciones básicas de un parlamento socavaría la base misma de la democracia en el país concernido”. Id., págs. 375-376. Así, la exigencia constitucional de publici-dad de las sesiones legislativas permite un contacto directo del legislador con sus constituyentes, de forma tal que éste pueda cumplir con su función constitucional de informarles sus ideas, preocupaciones y proyectos de forma inmediata y abierta.
No obstante, el peticionario en certificación, Hon. Thomas Rivera Schatz, arguye que “[a]unque la Constitución establece que las sesiones son públicas, eso no implica que exista un derecho constitucional a estar en las gradas”. Se alega que “[l]a publicidad se logra mediante diversas maneras. El mecanismo oficial de publicidad que dispone la Constitución de Puerto Rico en su Artículo III Sección 17 es el Diario de Sesiones”. Por último, se indica que “[s]e garantiza, además, que las sesiones sean públicas al trans-mitirse por internet, por televisión, mediante la presencia de la prensa y la participación de las minorías ...”. Caso Núm. CT-2010-0007, Certificación, pág. 21. Atendamos es-tos planteamientos en orden.
En primer lugar, la discusión anterior no deja margen a dudar que, en efecto, la cláusula estudiada crea un derecho constitucional de todo ciudadano a asistir a las sesiones camerales. No debemos perder de perspectiva que, tal y como discutimos anteriormente, se trata de un derecho co-existente al derecho constitucional a obtener información sobre los asuntos públicos y, por lo tanto, a la libertad de expresión, por lo que tiene la mayor preeminencia y no se puede restringir irrazonablemente. Por otro lado, además de un derecho ciudadano, es una obligación de cada una de las Cámaras Legislativas el cumplir con el mandato cons-titucional, pues los legisladores individuales también tie-nen el derecho de exigir que se cumpla con la mencionada *981 disposición, en tanto es un mecanismo que les permite cumplir a su vez con sus obligaciones parlamentarias.(8) Por lo tanto, no tiene razón el demandado al afirmar que no se trata de un derecho constitucional.
En segundo lugar, como bien mencionan los demanda-dos, la Sección 17 del Artículo III de la Constitución, esta-blece que se le “dará publicidad a los procedimientos legis-lativos en un diario de sesiones, en la forma en que se determine por ley”. El objetivo del diario de sesiones es que “quede una constancia cabal de lo que cada delegado ex-presa con respecto a cada enmienda o a cada asunto que es motivo de discusión en los procedimientos legislativos”. 3 Diario de Sesiones de la Convención Constituyente de Puerto Rico 1938 (1961). Después de todo, “el pueblo tiene derecho a que se le dé todos los días la información de lo que aquí hacen sus representantes”. íd., pág. 1943. No obs-tante, el hecho de que la Constitución exija que se desarro-lle un diario de sesiones, no implica que se pueda desaten-der el requerimiento de que las sesiones camerales sean públicas. Las cláusulas no son mutuamente excluyentes; al contrario, se coadyuvan en el objetivo que permea el Artí-culo III de mantener los procedimientos legislativos trans-parentes y a la ciudadanía bien informada.
Además, es una reconocida regla de hermenéutica que “el Legislador no hace cosas inútiles” ni “escribe cosas redundantes”. García v. Tribunal Superior, 91 D.P.R. 153, 156 (1964); R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed., San Juan, Pubs. JTS, 1987, Vol. 1, pág. 81. No podemos adoptar la interpretación pretendida por los demandados de la cláusula constitucional concernida, pues sería sancio-nar que la Asamblea Constituyente incluyó en nuestra Carta Magna una disposición vacua. Si hubiese sido sufi-ciente para brindar información y transparencia a la ciu- *982 dadanía sobre ios asuntos públicos el mantener un diario de sesiones, la Asamblea Constituyente no hubiese in-cluido una disposición específica y separada de aquella que lo exige, ordenando que las sesiones camerales fueran públicas.(9)
Por último, la parte demandada nos invita a concluir que la publicidad de las sesiones se garantiza con otros medios como lo son la televisión y la red cibernética. En apoyo de su argumento cita a Romero Barceló v. Hernández Agosto, supra. En ese caso, se cuestionó la utilización de fondos públicos para la transmisión de las vistas a cele-brarse por la Comisión de lo Jurídico sobre el P. del S. 1094, el cual propuso la creación del cargo de Fiscal Especial Independiente. Luego de examinar las facultades de los legisladores y la experiencia en Estados Unidos acerca del uso de la televisión en la diseminación parlamentaria de la información, concluimos que la alusión a un diario de sesiones en la Constitución no significa que ese sea el único modo de cumplir con la obligación informativa de la Asam-blea Legislativa, sino que se puede optar también por el uso de la televisión. Sin embargo, de allí no surge que el uso de la televisión pueda sustituir la obligación constitu-cional de mantener un diario de sesiones.
Igual solución se impone a la controversia ante la con-sideración del Tribunal. El mandato constitucional es claro y contundente: las sesiones de las cámaras serán públicas. El hecho de que existan nuevos medios mediante los cuales se pueda mantener al pueblo informado de los asuntos pú-blicos, no implica que se pueda prescindir de las obligacio- *983 nes impuestas por la Constitución. La televisión, el internet y cualquier otro medio de comunicación existente o futuro, son herramientas que asisten y apoyan al Estado a difundir la información pública en beneficio de la ciudadanía. Pero dichos medios de ninguna manera susti-tuyen el derecho de toda persona a asistir y presenciar, en vivo, las labores de nuestros legisladores.
Además, los demandados tienen que coincidir en que dichos medios, por masivos que sean, no brindan igual oportunidad a los ciudadanos de observar y escuchar los debates legislativos. La transmisión de la sesión por cual-quier medio se concentra en aquel legislador que en ese momento tenga el uso de la palabra, y deja fuera todas las otras acciones o reacciones de los demás legisladores. La expresión silente, la atención aguda de algunos o la des-atención de otros durante los debates, son también parte de la fiscalización que el pueblo está llamado a realizar de la Asamblea Legislativa. Por lo tanto, dichos medios, por útiles y valiosos que son, no reemplazan la oportunidad de presenciar personalmente una sesión legislativa.
Esta conclusión, no obstante, no significa que el derecho de asistir a las sesiones camerales sea absoluto o irrestricto. Desde luego, tiene que estar sujeto a cierta re-gulación por parte de la Asamblea Legislativa. Esa regula-ción puede incluir, por ejemplo, limitaciones a la asistencia por razón del cupo de las gradas o el establecimiento de normas claras sobre comportamiento para el público que asiste a las sesiones legislativas. No debemos olvidar que “[t]odo legislador debe preservar la dignidad e influencia del Cuerpo a que pertenece, mediante la observación de una actitud reverente hacia él”. Rigual, op. cit., pág. 205. No se le puede exigir menos al público que visite los hemi-ciclos camerales.
En ese tenor, el Presidente del Senado arguye que las acciones alegadamente realizadas por éste el 24 de junio de 2010 de excluir a los fotoperiodistas de los medios de co-municación de Puerto Rico del palco asignado para la prensa, y el 25 de junio de 2010 de excluir del referido *984 palco a todos los representantes de los medios noticiosos, se sostienen a la luz de las prerrogativas que le concede la Regla 26 del Reglamento del Senado, supra, págs. 77-82. Aduce que dicha medida respondió a que un fotoperiodista enfocó y tomó varias fotografías de documentos que se en-contraban en el estrado presidencial, referentes a la apro-bación del Presupuesto.
Puesto que una mayoría de este Tribunal no permitió que, mediante una vista evidenciaria, se depuraran los he-chos de lo acontecido durante los días finales de la pasada sesión ordinaria, no podemos responsablemente adjudicar la controversia ante nuestra consideración. Sin embargo, sí podemos afirmar que, aun tomando como cierto el argu-mento del demandado, el comportamiento indebido de un visitante de las sesiones camerales no justifica la exclusión de todos los visitantes y periodistas que allí se dan cita. No es aceptable la violación del derecho a asistir a las sesiones camerales de la totalidad del pueblo, por la actuación errada de uno solo de nuestros compueblanos. Una regula-ción que permita a cualquier oficial legislativo cerrar las puertas del Parlamento puertorriqueño a toda la ciudada-nía, escudándose en la alegada falta de orden de algún ciudadano, se revela irrazonable a la luz de la primacía del derecho restringido. Es preciso recordar que estamos ante un derecho de fundamental importancia, por lo que su re-gulación no puede ser arbitraria ni caprichosa.
Ante una situación de desorden en las gradas de los hemiciclos camerales, lo procedente sería suspender la se-sión y restaurar la normalidad para la continuación de los trabajos. De hecho, esa es la solución que el propio Regla-mento del Senado dispone para situaciones análogas al es-tablecer que “[e]n caso de ocurrir algún desorden en la Sala de Sesiones estando el Senado reunido, el Presidente podrá ordenar la suspensión de la sesión o decretar un receso a fin de tomar la acción que corresponda”. Sec. 6.1(j) del Re-glamento del Senado, supra.
Desconocemos el porqué no se siguió ese procedimiento y, por el contrario, se excluyó a todos los presentes en dicho *985 palco ese día y el próximo día no se permitió la entrada de persona alguna a las gradas o al palco de prensa. Tampoco sabemos por qué el Presidente del Senado no prefirió remover de las instalaciones únicamente al fotoperiodista que presuntamente incurrió en conducta impropia, por ejemplo, cancelando sus beneficios como miembro de la prensa según dispone el mismo Reglamento del Senado en la Sección 26.11, supra. Véase también Art. 3, Párr. 4, Or-den Administrativa del Senado Núm. 10-63, pág. 2.
La expulsión de los ciudadanos del recinto parlamenta-rio y la prohibición de entrada a éste son antagónicas a la aspiración de democracia participativa del pueblo puerto-rriqueño, plasmado en el Preámbulo de la Constitución. Ese tipo de acciones reviste la labor gubernamental de to-nos propios de otros regímenes extraños a nuestra natura-leza como pueblo. Como muy bien expresó el Prof. Efrén Rivera Ramos:
Permitir que el gobierno maneje los asuntos públicos bajo el manto de secretividad es invitar a la arbitrariedad, la mala administración, la indiferencia gubernamental, la irresponsa-bilidad pública y la corrupción. Rivera Ramos, supra, pág. 69.
Igualmente, impedir la cobertura de las sesiones legis-lativas por los medios de noticias constituye una afrenta a las mejores tradiciones de nuestro sistema de gobierno. Re-cordemos que “[e]n la esfera política, los medios informati-vos han sido llamados con propiedad ‘la cuarta rama del gobierno’, nombre que describe la función del periodismo como guardián fiel y motivador de las otras tres ramas”. Oliveras v. Paniagua Diez, 115 D.P.R. 257, 264 (1984), ci-tando a L. Brown, Responsabilidad Social de la Prensa, México, Eds. Asociados, 1977, pág. 9. Mediante la labor periodística, se educa al público, se ofrecen críticas, se le brinda a la ciudadanía un foro para la discusión y el debate, y se le facilita al ciudadano las noticias que por sí y como individuos no pueden o desean compilar. Santiago v. Bobb y El Mundo, Inc., 117 D.P.R. 153, 159 (1986). Dicha función informativa no se puede realizar adecuadamente si *986 el Estado mantiene los asuntos públicos bajo un manto de confidencialidad y misterio.
Debemos recalcar que, además del aspecto informativo de la prensa, ésta goza igualmente de un aspecto social y político importantísimo para la vida de la comunidad, pues ella es el vehículo mediante el cual se manifiesta la opinión pública y las relaciones del ciudadano y el Estado. L. Mu-ñoz Morales, Lecciones de Derecho Constitucional, Río Pie-dras, Junta Editora de la Universidad de Puerto Rico, 1949, T. I, págs. 141-142. La prensa es un instrumento necesario no sólo para recoger y difundir esa opinión pú-blica, sino también para encauzarla, siendo herramienta esencial del pueblo para influenciar a quienes se les ha delegado el poder y el privilegio de gobernamos. Para cum-plir con tan valiosa y delicada empresa, es necesario que los medios periodísticos tengan acceso a los centros de los cuales fluye la información de la gesta pública, como lo son los hemiciclos camerales. Así lo entendió la Asamblea Constituyente al ordenar, mediante la Sección 11 del Artí-culo III de la Constitución, supra, que las sesiones came-rales fueran públicas y así debemos, como intérpretes de ese documento histórico, reconocerlo.
A pesar de todo lo anterior, este Tribunal hoy desoye un reclamo novel, apremiante y justiciable de talante fundamental. El acceso de la ciudadanía y la prensa a las sesiones legislativas no es poca cosa. Es necesario para el mejor funcionamiento de nuestro sistema de democracia representativa y así lo conmina el documento que todo fun-cionario público, incluyendo el Presidente del Senado, juró obedecer y defender: la Constitución del Estado Libre Aso-ciado de Puerto Rico. En vista de que difiero del criterio mayoritario, pues estimo que estamos ante una controver-sia justiciable relacionada a un mandato constitucional, enérgicamente, disiento.

 Uno de los recursos es un mandamus (MD-2010-07) presentado en jurisdic-ción original ante este Tribunal por varios medios noticiosos. El segundo es un re-curso de certificación (CT-2010-07) expedido por la mayoría, que se refiere a una demanda de injunction, sentencia declaratoria y solicitud de mandamus presentada por varios senadores y un ciudadano en particular en contra del Presidente del Se-nado y el Secretario de dicho cuerpo.

 Resaltamos el trámite ponderado, serio y profesional que este caso siguió ante el Tribunal de Primera Instancia. Rechazamos por lo tanto su cuestionamiento gratuito por parte de la mayoría.
La mayoría cuestiona la “premura inusitada” del tribunal de instancia al aten-der este caso; sin embargo, no ve problema alguno en la “musitada premura” con la cual expidió el auto de certificación para traer, a destiempo, este caso ante su consideración. Esta práctica se ha tornado rutinaria en casos que tratan de asuntos públicos.

 En la mejor técnica adjudicativa, las determinaciones fácticas de un tribunal inferior son necesarias para evaluar, por ejemplo, la conducta del Presidente del *956 Senado a los efectos de examinar si estamos ante un asunto académico o si sus actos se ajustan a las exigencias de la Constitución del Estado Libre Asociado de Puerto Rico.

 Nos preocupa la proclividad de la mayoría de expedir peticiones de certifica-ción en cada ocasión en que se plantean controversias públicas, pues ello no permite que las controversias maduren apropiadamente. Con este proceder la mayoría actúa como un foro de instancia y no como el más Alto Tribunal de un país. Además, se menosprecia la labor de los jueces de instancia pues se crea la impresión de que no deben atender casos controversiales y del interés de los poderes públicos del país.
Por otro lado, estar continuamente atendiendo asuntos de dimensión constitu-cional en primera instancia, nos asemeja más al modelo concentrado de adjudicación constitucional que al difuso que recoge, al presente, nuestra Constitución.

 “Además, hay que interpretarlas de la manera más favorable para el demandante. Así, en casos como el de autos, donde se plantea la desestimación por falta de jurisdicción en la materia, es necesario determinar si, tomando como cierto lo alegado por el demandante, el foro tiene jurisdicción para atender el reclamo.” (Citas omitidas.) Harguindey Ferrer v. U.I., 148 D.P.R. 13, 30 (1999).

 Habiendo concluido que los Senadores demandantes tienen legitimación ac-tiva para instar ante el foro de instancia el pleito que fue certificado, es innecesario expresarnos sobre la legitimación activa del señor Lozano Santos.

 Decía el historiador romano Tácito: “Quien se enfada por las críticas, reco-noce que las tenía merecidas.”

 No expreso criterio, por no estar ante la consideración del Tribunal, sobre la validez de legislación aprobada mientras se suscite una violación de la cláusula constitucional que exige que las sesiones camerales sean públicas.

 En apoyo a esa conclusión, en el Diario de Sesiones de la Convención Cons-tituyente, el delegado Francisco Paz Gránela quiso incluir en la cláusula sobre la publicidad de las sesiones camerales, la disposición que obligaría a la Asamblea Legislativa a adoptar un diario de sesiones. Por oposición del delegado Luis Negrón López, dicha enmienda fue derrotada, pues ya la Comisión sobre la Rama Legislativa de la Convención había recomendado la publicidad de las labores legislativas en la sección que trataba sobre el procedimiento legislativo, la cual posteriormente se con-virtió en la Sección 17 del Artículo III. Véase 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico 852-854 (1961). Lo anterior significa que los constitu-yentes estaban claros en que se trataba de dos disposiciones separadas, con signifi-cados distintos.